**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Coalition for Sonoran Desert Protection, et al.,

   Plaintiffs,

v.

Federal Highway Administration, et al.,

   Defendants.

No. CV-22-00193-TUC-JCH

**ORDER**

Before the Court is Defendants' partial motion to dismiss ("Motion") for lack of subject matter jurisdiction. Doc. 18. Under the Administrative Procedure Act ("APA"), a Court has jurisdiction to review final agency action. 5 U.S.C. § 704. The question here is whether the agencies' "Section 4(f) Evaluation"—incorporated and published with the agencies' Record of Decision—is such "final agency action" for purposes of subject matter jurisdiction. The Court finds that it is and denies Defendants' Motion.

**I.    Background**

Plaintiffs, the Coalition for Sonoran Desert Protection, Center for Biological Diversity, Friends of Ironwood Forest, and Tucson Audubon Society, (collectively "Plaintiffs"), sued challenging both the Tier 1 Record of Decision ("ROD") and the "Final Preliminary Section 4(f) Evaluation" ("Section 4(f) Evaluation"). Compl. ¶¶ 102–116. Named Defendants include the Federal Highway Administration ("FHWA") and Karla Petty (Arizona Division Administrator, FHWA), (collectively "Defendants"). Compl. ¶¶ 18–19. The Complaint alleges violations under the National Environmental

Policy Act ("NEPA"),[1] Section 4(f) of the Department of Transportation Act ("Section 4(f)"),[2] and the APA.[3] Plaintiffs seek declaratory and injunctive relief. *See* Compl. pp. 42.

The allegations concern a proposed 280-mile corridor, located between Nogales and Wickenburg, Arizona, for the Interstate-11 Project ("I-11 Corridor" or "Project"). Compl. ¶ 68. Plaintiffs assert two claims.[4] In Count One, Plaintiffs contend that FHWA's Tier 1 ROD and Section 4(f) Evaluation (together the "Tier 1 Evaluation") violated NEPA and the APA. Compl. ¶¶ 102–04. In Count Two, Plaintiffs allege Defendants violated Section 4(f) by failing to comply with its statutory provisions. Compl. ¶¶ 105–112. Specifically, Plaintiffs argue that Defendants were required in Tier 1 to identify properties protected or unprotected under Section 4(f) and evaluate the potential use of these properties as early as practicable. *Id.* By designating certain properties as unprotected under Section 4(f) and deferring designation of others (and thereby deferring Section 4(f) analyses), the Tier 1 Evaluation has "prejudiced alternatives without an adequate Section 4(f) evaluation of these lands." Doc. 27 at 16. Defendants move to dismiss Count Two, the Section 4(f) claims, only. Doc. 18.

The Court heard oral argument on January 25, 2023. *Coalition for Sonoran Desert Protection et al. v. Federal Highway Administration et al.*, 4:22-CV-00193-TUC-JCH (D. Ariz. January 25, 2023), Hr'g Tr. at 01:04 (hereinafter "Hr'g Tr.").

**A. Statutory and Regulatory Background**

    **i.   NEPA**

NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and

---

[1] 42 U.S.C. §§ 4321 *et seq.*
[2] 49 U.S.C. § 303; *see also* 23 U.S.C. § 138.
[3] 5 U.S.C. §§ 706 *et seq.*
[4] Plaintiffs previously alleged a claim under the Fish and Wildlife Coordination Act, 16 U.S.C. § 663(d). The parties stipulated to dismiss Count Three on the understanding that it would not be time-barred should Defendants choose to proceed with the West Option for the I-11 Project. *See* Doc. 26 at 2. On October 11, 2022, this Court granted the stipulation and dismissed without prejudice Count Three. *See* Doc. 30.

natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). "NEPA does not require agencies to adopt any particular internal [decision-making] structure." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983). Instead, NEPA requires agencies to follow a particular decision-making process. Relevant here, the FHWA must complete Environmental Assessments and Environmental Impact Statements "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1500.1(c) (stating that "[t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences…").[5]

An Environmental Impact Statement ("EIS") must be included "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. An EIS is comprised of various sections, including: (1) the purpose and need for the action; (2) the alternatives including the proposed action; and (3) the affected environment and environmental consequences of the proposed action. 40 C.F.R. § 1502.10(d)–(g). The "purpose and need" statement "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The "alternatives" section "is the heart" of an EIS and requires agencies to "[r]igorously explore and objectively evaluate all reasonable

---

[5] The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA. *See* 40 C.F.R. § 1500.1, *et seq.* In 2020, the regulations were revised, *see* 85 Fed. Reg. 43304-01 (July 16, 2020), and apply to any NEPA process begun after September 14, 2020, or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020). Here, the NEPA process began before September 2020, *see* 81 Fed. Reg. 32007 (May 20, 2016), and the EIS nowhere indicates that FHWA chose to apply the 2020 rules to this project. All citations to the NEPA regulations herein refer to those codified at 40 C.F.R. Part 1500 (1978). *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 n.5 (9th Cir. 2022) ("[W]e look at the regulations in place at the time of the challenged decision.")

alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 49 C.F.R. § 1502.14(a). The environmental consequences section must discuss both direct and indirect effects of the proposed action and the "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16. Within the alternatives analysis, the agency must assess: (a) a "no action" alternative, (b) other reasonable courses of action not within the jurisdiction of the lead agency, and (c) mitigation measures not already included in the proposed action or alternatives. *Id.* § 1502.14(b)-(f).

NEPA's regulations provide for a "tiered" environmental analysis. Tiering refers to "the coverage of general matters in broader [EIS analyses] with subsequent narrower statements or environmental analyses (such as regional or basin[-]wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.1. "Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review...." 40 C.F.R. § 1502.20. A properly tiered analysis consists of "a broad environmental impact statement" followed by "a subsequent statement or environmental assessment ... on an action included within" the program or policy contemplated in the broad statement. 40 C.F.R. § 1502.20. The subsequent statement "shall concentrate on the issues specific to the subsequent action[,]" and it "need only summarize the issues discussed in the broader statement[.]" 40 C.F.R. § 1502.20.

### ii.    Section 4(f)

Whereas NEPA "prohibits uninformed—rather than unwise—agency action[,]" there are "[o]ther statutes [that] impose substantive environmental obligations on federal agencies[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). Section 4(f) is one such statute. Under Section 4(f), the statute allows the Secretary of

- 4 -

Transportation to:

> approve a transportation program or project...requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c). An alternative is infeasible only when it "cannot be built as a matter of sound engineering judgment." 23 C.F.R. § 774.17(2). Section 4(f) regulations require the preparation of an evaluation that "shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property." 23 C.F.R. § 774.7(a).

In a Tier 1, broad-scale EIS, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. 23 C.F.R. § 774.7(e)(1). As such, the Section 4(f) Evaluation "should address the potential impacts that a proposed action will have on a Section 4(f) property and whether those impacts could have a bearing on the decision to be made." 23 C.F.R. § 774.7(e)(1). The Section 4(f) Evaluation may make a preliminary determination whether the project's impacts on Section 4(f) property are de minimis, or whether there are feasible and prudent avoidance alternatives. 23 C.F.R. § 774.7(e)(1). A preliminary Section 4(f) approval must be incorporated into the first-tier EIS and finalized in the second-tier study. 23 C.F.R. § 774.7(e)(1), (2). "The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study." 23 C.F.R. § 774.9(a).

Section 4(f) applies not just to the agency's direct use of a Section 4(f) property but also to the "constructive use" of a nearby Section 4(f) property. 23 C.F.R. § 774.17; 23

C.F.R. § 774.15(b). "A constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." 23 C.F.R. § 774.15(a).

### iii.   The APA's Relevance to Plaintiffs' Section 4(f) challenges

Violations under NEPA and Section 4(f) are reviewable under the APA. Because NEPA does not provide an independent cause of action when a federal agency violates NEPA procedures, a lawsuit alleging noncompliance with NEPA procedures is reviewed under 5 U.S.C. § 701. *See Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1062 (9th Cir. 2005). Likewise, the Secretary of Transportation's Section 4(f) decisions are reviewed under 5 U.S.C. § 706(2). *See Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1449 (9th Cir. 1984).

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *See* 5 U.S.C. §§ 702, 704. The APA directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(A). Section 702 provides a right to judicial review for a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 702; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

### B.  Factual Background

### i.   Draft EIS[6]

In May 2016, FHWA and the Arizona Department of Transportation ("ADOT")[7] issued a Notice of Intent to Prepare a Tier 1 EIS for the proposed I-11 Corridor. Compl. ¶ 68. Materials presented during the scoping period[8] indicated the potential for either

---

[6] The parties did not provide a copy of the Draft EIS, therefore all allegations regarding the Draft EIS are taken from the Complaint and ROD.

[7] ADOT, as the local Project sponsor under 23 U.S.C. § 326, intervened as an Intervenor-Defendant in this action. *See* Doc. 24. ADOT did not brief the Motion to Dismiss.

[8] Scoping is a process that continues throughout the planning and early stages of an environmental

collocating the I-11 Corridor with Interstate-19 and Interstate-10 through Pima County, or the development of a new I-11 corridor in the Avra Valley located west of Tucson. Compl. ¶ 68. After the scoping period, FHWA and ADOT identified alternatives for analysis in the EIS. Compl. ¶ 70. FHWA and ADOT prepared a Draft EIS and Preliminary Section 4(f) Evaluation for the Project (together "Draft EIS") that issued on April 5, 2019.  Compl. ¶ 71. The Draft EIS considered several alternative routes for the corridor including three "end-to-end Build Corridor Alternatives." Compl. ¶ 75–76; ROD at 16–19; s*ee also* Appendix A ("Figure 4").

Figure 4 depicts the Build Corridor Alternatives under consideration and color-codes them. As depicted, each Build Corridor Alternative is comprised of a different combination of individual sections. Compl. ¶ 75–76; ROD at 16. For example, the Purple and Green Alternatives were comprised of segments mostly creating new corridors throughout the Project study area, including a new corridor that would run north-south through Avra Valley, west of Tucson. Compl. ¶ 75. The Orange Alternative would co-locate the Project with Interstates 19, 10, and 8, and other state and county highways on eight of nine identified segments. Compl. ¶ 75. The Draft EIS also considered a "Recommended Alternative" that was a hybrid of the Green and Purple Alternatives and included a segment traversing the Avra Valley. Compl. ¶ 76. The Draft EIS found that the Orange Alternative would cause the least harm to biological resources as compared to the Green and Purple Alternatives. Compl. ¶ 80.

The Draft EIS also considered a No Build Alternative. The No Build Alternative represented "the existing transportation system and [assumed] the existence of committed improvement projects that are programmed for funding in ADOT's construction and funding plans for 2019–2024." Compl. ¶ 78. For example, "modal alternatives" included a freight and passenger rail, but "assumed that these planned projects were not part of the No Build Alternative, or would not have any effects on traffic or highway travel demand under

---

impact statement and is required for an environmental impact statement. *See* 43 C.F.R. § 46.235 ("NEPA scoping process").

the No Build Alternative." Compl. ¶ 77. The Draft EIS found the No Build Alternative would not meet the Project's purpose and need, reasoning it would both worsen traffic congestion and create more pollution. Compl. ¶ 79. In its conclusion, the Draft EIS indicated that the agencies would select either: (1) a 2,000-foot-wide Build Corridor Alternative; or (2) the No Build Alternative. Compl. ¶ 72. If the agencies selected the Build Corridor Alternative, the process would require Tier 2 NEPA environmental studies to determine the specific alignment within the I-11 Corridor. Compl. ¶ 72.

The Draft EIS included a Draft Section 4(f) Evaluation that found neither the Ironwood Forest National Monument nor Sonoran Desert National Monument qualified for Section 4(f) protection because they were not primarily managed for public recreation. Compl. ¶ 84. The Draft Section 4(f) Evaluation also found that Saguaro National Park and Tucson Mountain Park were "protected by Section 4(f) as a park and recreation resource" but the Project would not result in the direct use or constructive use of either park. Compl. ¶ 86. Further, the Draft Section 4(f) Evaluation did not perform a Section 4(f) analysis on the ecological impacts to Saguaro National Park or Tucson Mountain Park, finding that neither property was a wildlife or waterfowl refuge. Compl. ¶¶ 87–88.

FHWA and ADOT received over 12,000 written and oral public comment submissions during the Draft EIS comment period, including comments on the Draft Section 4(f) Evaluation. Compl. ¶¶ 81, 84. For example, the National Park Service objected to FHWA's failure to consider the ecological impacts on Saguaro National Park because it was not designated a wildlife or waterfowl refuge under Section 4(f) (Compl. ¶ 87); Pima County and the Arizona Game and Fish Department objected to FHWA's failure to consider the ecological impacts on Tucson Mountain Park because it was not designated a wildlife or waterfowl refuge under Section 4(f) (Compl. ¶88); and the Bureau of Land Management objected to FHWA's determination that neither Ironwood Forest National Monument nor Sonoran Desert National Monument qualified for Section 4(f) protection because they were not primarily managed for public recreation (Compl. ¶ 84). Despite the objections, the determinations remained unchanged in the Final EIS.

ii.     **Final EIS**

On July 16, 2021, FHWA and ADOT issued the Final Tier 1 EIS and Preliminary Section 4(f) Evaluation (together the "Final EIS"). Compl. ¶ 90. The Final EIS differed from the Draft EIS by identifying a "Preferred Alternative" for the Project, a route which would ultimately be incorporated into the ROD. Compl. ¶ 90. The Final EIS also indicated that it made refinements from the Draft EIS in response to public comment:

> FHWA and ADOT considered the findings of the Draft Tier 1 EIS as well as the public and agency comments in preparation of the Final Tier 1 EIS and revised Draft Preliminary Section 4(f) Evaluation, including the creation of a Preferred Alternative in this Final Tier 1 EIS that is different from the Recommended Alternative in the Draft Tier 1 EIS. The Preferred Alternative balances transportation needs with impacts to the natural and human environment and stakeholder input.

Final EIS, Doc. 18-2 at 252. For example, the Final EIS responded to the Bureau of Land Management's ("BLM") objections. As to Ironwood Forest National Monument, the Final EIS explained:

> BLM also designated the Ironwood Forest National Monument as a Special Recreation Management Area. The Special Recreation Management Area is a management tool that allows BLM to plan and implement recreation activities in a manner that ensures the primary purpose of the property is protected. While the Special Recreation Management Area, in addition to the *Resource Management Plan*, is an important planning tool for BLM to balance the needs of and demands upon multiple resources on the property, the Special Recreation Management Area is not the source for the original, formal designation of the property, and therefore, is not the source of the primary purpose of the property as defined by Section 4(f). On the basis of these Section 4(f) tests, FHWA assessed that, although Ironwood Forest National Monument contains publicly owned land that is open to the public, the primary purpose of the Ironwood Forest National Monument is not a park, recreation area, wildlife or waterfowl refuge, or historic site as defined by Section 4(f). Thus, FHWA preliminarily determined that Ironwood Forest National Monument is not protected under Section 4(f).

Final EIS, Doc. 18-2 at 287.  As to the Sonoran Desert National Monument, the Final EIS explained:

> BLM's *Sonoran Desert National Monument Record of Decision and Approved Resource Management Plan* (BLM 2012) specifically states that the Proclamation is the principal direction for management of the property; all other considerations are secondary to that edict. The RMP empowers

1
2
3
4
5
6

> BLM to balance the availability and function of all resources within the Sonoran Desert National Monument for multiple uses. Within the RMP, BLM identifies other, secondary uses (including recreation) that may be allowed under specific criteria so that the primary purpose of the property is supported. However, based on this information, FHWA assesses that recreation as a secondary use is not relevant to the Section 4(f) test of primary purpose; the Sonoran Desert National Monument is not protected by Section 4(f). Historic and recreation resources within the monument are protected by Section 4(f).

7
8
9
10
11

Final EIS, Doc. 18-2 at 288 (italicization in original). Defendants maintained that neither Ironwood Forest National Monument nor Sonoran Desert National Monument qualified for Section 4(f) protection. Thus, the Preliminary Section 4(f) Evaluation did not consider the Project's ecological impacts on either property, or whether those impacts resulted in a constructive use of either property. Final EIS at 4-36–4-37.

12
13
14
15
16
17
18
19
20
21
22
23

Other previous Section 4(f) designations remained unchanged in the Preliminary Section 4(f) Evaluation, for example: the Project did not consider whether Tucson Mountain Historic District was a "historic site" protected by Section 4(f). Compl. ¶¶ 86, 87, 98; FEIS at 4-108. The Final EIS' Preliminary Section 4(f) Evaluation also postponed to Tier 2 determinations whether certain properties, e.g., Avra Valley Wildlife Corridor ("Avra Valley Lands"), were protected under Section 4(f).[9] Compl. ¶ 98; FEIS at 4-108. The Final EIS triggered a 30-day public review period where comments "echoed many of the same concerns raised by the public, agencies, and local governments in the prior scoping and Draft EIS comment periods." Compl. ¶ 92. Plaintiffs further allege, "[p]ublic comments requested an extension of the 30-day review period … given the many changes between the Recommended Alternative and Preferred Alternative, but FHWA denied the

24
25
26
27
28

[9] Pima County submitted a written objection during the Draft EIS comment period, (Final EIS, Doc. 18-2 at 289), and identified nine properties as potentially protected under Section 4(f), including: (1) the Avra Valley Wildlife Corridor; (2) the CAVSARP mitigation land; (3) the Cortaro-Hartman donation; (4) the Diamond Bell Ranch mitigation land; (5) the Brawley Wash-Twin Peaks flood prevention land; (6) the Los Robles Wash – Trico Wash mitigation land; (7) the Red Point Cascada donation land; (8) the Valencia conservation land; and (9) the Wexler property. It is unclear from the available record whether any of these properties were initially considered during the Draft EIS or raised for the first time by Pima County during the Draft Tier 1 EIS public comment period.

1    extension request." Compl. ¶ 99.

2        **iii.    Tier 1 Evaluation**

3        On November 15, 2021, FHWA issued its Tier 1 Evaluation comprised of the

4    Record of Decision and Final Preliminary Section 4(f) Evaluation. Doc. 18-3 at 1–52 (the

5    "ROD"). The ROD selected a 280-mile route for the I-11 Corridor, beginning in Nogales,

6    Arizona, traversing through the Santa Cruz, Pima, Maricopa, and Yavapai counties, and

7    ending in Wickenburg, Arizona. ROD at 8, 24; Compl. ¶ 1; *see also* Appendix B ("Figure

8    8"). The ROD defers to Tier 2's decision-making process, facilitated under ADOT's

9    direction, the specific 400-foot-wide alignment within the 2,000-foot-wide selected

10   corridor. ROD at 8, 24. The ROD also defers to Tier 2 the corridor route through Pima

11   County, and specifically the determination whether to (1) co-locate the Project with

12   Interstate-19 and Interstate-10 in and around Tucson between Sahuarita and Southern Pinal

13   County (the East Option); or (2) create a new highway corridor through the Avra Valley,

14   located west of Tucson (the West Option). ROD at 28; *see also* Appendix B ("Figure 8").

15       **C. Motion to Dismiss**

16       Under Fed. R. Civ. P. 12(b)(1), Defendants move to dismiss Count Two, asserting

17   subject-matter jurisdiction is lacking because the Section 4(f) Evaluation is not "final

18   agency action." Doc. 18. First, Defendants argue the Section 4(f) Evaluation does not

19   "mark the consummation" of the FHWA's decision-making process because ADOT will

20   revisit, reconsider, and broaden the scope of its Section 4(f) analysis in Tier 2 and make

21   final Section 4(f) determinations. Doc. 31 at 2 (internal quotations and citations omitted).

22   Second, Defendants assert the Section 4(f) Evaluation is preliminary because it does not

23   grant approvals for specific Section 4(f) resources and thus there is no determination "from

24   which rights or obligations flow" as supported by caselaw interpreting "final agency

25   action." *See* Doc. 18 at 12.

26       Plaintiffs respond that the final agency action is not the Section 4(f) Evaluation, but

27   the November 15, 2021 ROD which fails to comply with Section 4(f)'s statutory

28   requirements. Doc. 27 at 15. Plaintiffs claim Defendants' failure to conduct a correct

1    Section 4(f) analysis for Saguaro National Park, Tucson Mountain Park, and the "Avra
2    Valley Lands" is actionable because the Tier 1 Evaluation has "prejudiced alternatives
3    without an adequate Section 4(f) evaluation of these lands." Doc. 27 at 16. Plaintiffs argue
4    in the alternative that even if the Section 4(f) claims challenge "preliminary"
5    determinations underlying the ROD, the claim is still actionable under APA § 704, which
6    provides for judicial review of preliminary actions "upon review of final agency action."
7    *Id.*

8    **II.     Legal Standard**

9            Dismissal is appropriate under Rule 12(b)(1) when the Court lacks subject matter
10   jurisdiction over the claim. When a defendant moves to dismiss for lack of subject matter
11   jurisdiction under Rule 12(b)(1), the plaintiff has the burden of establishing subject matter
12   jurisdiction. *See Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1102, n.1 (9th Cir. 2007)
13   ("Once challenged, the party asserting subject matter jurisdiction has the burden of proving
14   its existence."). A jurisdictional attack under Rule 12(b)(1) may be facial or factual. *Safe*
15   *Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). A
16   "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are
17   insufficient on their face to invoke federal jurisdiction." *Id.* The district court resolves a
18   facial attack, as it would a motion to dismiss under Rule 12(b)(6), by accepting the
19   plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor
20   and determining whether the allegations are sufficient as a legal matter to invoke the court's
21   jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir.2013).

22            By contrast, in a factual attack, the challenger disputes the truth of the allegations
23   that, by themselves, would otherwise invoke federal jurisdiction. *Safe Air for Everyone*,
24   373 F.3d at 1039. If the moving party asserts a factual attack, a court may resolve the
25   factual disputes by "look[ing] beyond the complaint to matters of public record, without
26   having to convert the motion into one for summary judgment." *White v. Lee*, 227 F.3d
27   1214, 1242 (9th Cir.2000). The court "need not presume the truthfulness of the plaintiff's
28   allegations." *Id.* However, a "jurisdictional finding of genuinely disputed facts is

inappropriate when the jurisdictional issue and the substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the 'merits' of an action." *Safe Air for Everyone*, 373 F.3d at 1039 (internal citations and quotations omitted). The question of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Id.* (internal quotations omitted).

### III.   Analysis

Final agency action must (1) "mark the consummation of the agency's [decision-making] process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, (1997). In making this determination, courts "focus on the practical and legal effects of the agency action," determining finality "in a pragmatic and flexible manner." *Or. Natural Desert Ass'n*, 465 F.3d at 982 (citation omitted).

### A.   Consummation of the Agencies' Decision-Making Process

Generally, NEPA documents and RODs mark the consummation of an agencies' decision-making process.[10] Recently, the Ninth Circuit considered agency action related to NEPA and the Coastal Zone Management Act. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 862 (9th Cir. 2022). The specific question raised in *Environmental Defense Center* was whether "an agency's conclusion in a programmatic environmental review that a proposed action would not have a significant environmental impact constitutes agency authorization of that proposed action, even if the agency will have to approve subsequent, individual permits before that action can occur." *Id.* at 864. Rejecting

---

[10] *See, e.g.*, *Laub*, 342 F.3d at 1087–93 (reversing district court's finding that an Environmental Impact Statement/Environmental Impact Report was not a final agency action ripe for review); *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) (explaining that "[o]nce an EIS's analysis has been solidified in a ROD, an agency has taken final agency action); *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1503 (9th Cir. 1995) (holding a ROD as a final agency action); *accord Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 815 (8th Cir. 2006) (finding that a Finding of No Significant Impact is a "final agency action" and noting that "[t]he Supreme Court has strongly signaled that an agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review under NEPA").

the agencies' claim that the Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") were merely "preliminary steps toward making a decision," the Ninth Circuit found that the EA and FONSI culminated the agencies' environmental review process. *Id.* at 868 (internal quotation omitted). The Court explained:

> The NEPA review process concludes in one of two ways: (1) the agency determines through an EA that a proposed action will not have a significant impact on the environment and issues a FONSI, or (2) the agency determines that the action will have a significant impact and issues an EIS and record of decision … Final NEPA documents constitute "final agency action" under the APA, whether they take the form of an EIS and Record of Decision or an EA and FONSI, because they culminate the agencies' environmental review process.

*Id.* Because the programmatic conclusions would not be revisited, the Ninth Circuit found that plaintiffs were able to show a consummation of the agencies' decision-making process. *Id.*

Here, the Section 4(f) Evaluation is intertwined with the ROD. Defendants concede the ROD is final agency action, Hr'g Tr. at 11:19–11:24, and their Notice in the Federal Register makes no distinction between the ROD and the Section 4(f) Evaluation. *See* "Notice of Final Federal Agency Actions on the Interstate-11 (I-11), Nogales to Wickenburg, in Santa Cruz, Pima, Pinal, Maricopa and Yavapai Counties, AZ," 86 Fed. Reg. 66385 (Nov. 22, 2021). Defendants nevertheless argue that the Section 4(f) Evaluation does not constitute final agency action and is severable from the ROD for purposes of subject matter jurisdiction. Specifically, Defendants argue they did not approve or authorize the use of Section 4(f) resources and have not made final Section 4(f) property determinations.

### i. During Tier 2, ADOT could revisit preliminary findings made during Tier 1, but it has no apparent obligation or incentive to do so

The issue presented here is one of first impression. Defendants point the Court to *Openlands v. United States Dep't Transportation*, 124 F. Supp. 3d 796 (N.D. Ill. 2015) for guidance. Doc. 18 at 13. In *Openlands,* the district court considered the federal and state agencies' Tier 1 EIS and ROD for the Illiana Corridor Project, a proposed interstate tollway

between Will County, Illinois and Lake County, Indiana. *Id.* at 798, 810. After receiving input from a variety of stakeholders and analyzing dozens of potential corridor routes, the agencies chose three potential corridors to analyze in the Draft EIS: A3S2 (the northernmost alternative that runs north of the Midewin National Tallgrass Prairie ("Midewin")), B3 (a corridor adjacent to the south side of Midewin), and B4 (a variation of B3 with a more southern terminus in Indiana). *Id.* at 799. The district court in *Openlands* found the agencies violated NEPA and remanded for further administrative proceedings, but it also determined that the plaintiffs' Section 4(f) claims were not yet ripe for review under the APA. *Id.* Relying on language in the final EIS, the district court found the Agencies' determinations as to all 4(f) properties were preliminary and not final agency action. *Id.* Specifically, the final EIS in *Openlands* indicated:

> An evaluation of the proposed project's potential impacts to Section 4(f) properties is being conducted under § 774.7(e), which allows for a preliminary Section 4(f) approval for Tier One documents, *provided that opportunities to minimize harm at subsequent stages are not precluded by decisions made in Tier One*. Section 4(f) approval will be finalized in Tier Two. *A preliminary Section 4(f) approval would be subject to a reevaluation if new or more detailed information becomes available during the Tier Two NEPA studies*. Feasible and prudent avoidance alternatives, if any, should be identified, and all possible conceptual planning to minimize impacts will be discussed in the Tier One NEPA studies. Further evaluation of measures to minimize harm to Section 4(f) properties will also occur in the Tier Two NEPA studies.

*Id.* at 810 (emphasis added).

The Tier 1 EIS in *Openlands* designated the "Midewin National Tallgrass Prairie" ("Midewin") as a Section 4(f) property, entitled to protection and determined that the B3 Corridor would not directly use Midewin. The plaintiffs did not challenge either of these findings. Rather, the plaintiffs' Section 4(f) challenge centered on the EIS's determination that, "[b]ased on the information available at Tier [1], a constructive use of this resource (Midewin) is not anticipated." *Id.* at 810 Significantly, the Tier 1 EIS further provided, "[t]he potential for a constructive use will be further analyzed in the Tier [2] NEPA studies." *Id.* Also, the Tier 1 EIS called for "[f]urther evaluation of measures to minimize

harm" to Midewin during Tier 2. *Id.* Thus, in *Openlands* the district court found the Section 4(f) determination was not final or ripe for review under the APA. *Id.*

In contrast to *Openlands*, the alleged violations here center on the Defendants' Tier 1 designations of certain properties as protected or unprotected under Section 4(f). At this juncture, the question of jurisdiction and the merits of the action are intertwined as Section 4(f) provides the basis for both subject-matter jurisdiction and Plaintiffs' substantive claims for relief. *See Safe Air for Everyone*, 373 F.3d at 1039. Thus, the Court must assume the Complaint's allegations are true and, therefore, Defendants erroneously designated the properties at issue, including two national monuments and a national park as unprotected under Section 4(f).[11]

The Court takes the Complaint's allegations as true and assumes Defendants erroneously deferred Section 4(f) designations and analyses with respect to other properties. For example, during the Draft EIS comment period, Pima County identified nine properties[12] as potentially protected under Section 4(f). Final EIS, Doc. 18-2 at 289. With respect to these properties, the Final EIS indicated that "ADOT will consult further with Pima County during Tier 2 studies to determine which properties are protected by Section 4(f) and to complete a Section 4(f) evaluation for protected properties." *Id.* In contrast, the available documents demonstrate that other properties, previously designated as unprotected, kept their unprotected designations even after feedback from the Bureau of Land Management, the National Park Service, and Arizona Game and Fish, among others. Hr'g Tr. at 25:09.

ADOT was involved in the Tier 1 process. Hr'g Tr. at 07:04. Plaintiffs argue that ADOT's role in Tier 2 is not as an independent evaluator of the FHWA's prior Tier 1 decisions and determinations. Hr'g Tr. at 36:22–37:15. Rather, ADOT will step into the shoes of the highway administrator at Tier 2 to determine the specific roadway alignment

---

[11]As a procedural matter, the district court in *Openlands* considered whether the alleged Section 4(f) violation was ripe, a legal issue raised in a motion for summary judgment. Thus, the district court in *Openlands* had a complete Tier 1 administrative record to work from. *See infra* Part B.i.
[12] *See supra* footnote 9, at 10.

within the 2,000-foot-wide selected corridor. *Id.* Plaintiffs contend that it makes no sense for ADOT to go back and revisit Section 4(f) Tier 1 determinations that underlie the selected corridor. Hr'g Tr. at 34:20. FHWA was unable indicate what additional information might surface during Tier 2 that the FHWA had not already considered before making its Section 4(f) Tier 1 designations. Hr'g Tr. at 10:14 (The Court: "What new information is potentially going to come out about any of these properties that hasn't already been considered at this point?"); Hr'g Tr. at 12:11 (The Court: "I know it says preliminary, but [the Final EIS] goes through various properties including, for example, the Ironwood Forest National Monument, and provides an analysis as to why the Federal Highway Administration … determined that these properties were not Section 4(f) properties … So what more analysis is there to be done at this point on these issues?").[13] Nor has FHWA explained why ADOT, having been involved in Tier 1 since 2016, would have any motivation to revisit these allegedly erroneous Section 4(f) determinations. Common sense suggests that ADOT is highly unlikely to revisit Section 4(f) Tier 1 determinations absent some express mandate to do so and there is none. Although ADOT may have the plenary authority to revisit Section 4(f) designations, it is not obligated to do so. *See* Hr'g Tr. at 39:12–40:13.

And that leads to another key distinction between this case and *Openlands.* Unlike the Tier 1 EIS and ROD in *Openlands*, the instant ROD lacks express language indicating: (1) that opportunities to minimize harm at subsequent stages are not precluded by decisions made in Tier 1; or (2) that any preliminary Section 4(f) approval would be subject to reevaluation if new or more detailed information becomes available after Tier 2 NEPA studies begin. *C.f. Openlands*, 124 F. Supp. 3d at 810. By way of comparison, the instant ROD provides:

///

---

[13] In response to both questions, FHWA relied on ADOT's future role in approving Section 4(f) resources. Hr'g Tr. at 14:12 (FHWA: "ADOT is still free to reevaluate those preliminary determinations and that's what makes them preliminary.") As the Court explained, however, this speaks to ADOT's approved use of Section 4(f) resources and does not answer whether ADOT is obligated to revisit any Section 4(f) designations made in Tier 1. Hr'g Tr. at 13:10.

As set forth in 23 CFR 774.7(e)(1), FHWA completed a Preliminary Section 4(f) Evaluation, including avoidance alternatives, potential use analysis, and measures to minimize harm. *See* ROD Chapter 5 (Project Commitments). ADOT will complete Section 4(f) evaluations during the Tier 2 analyses. *Specifically, ADOT will refine the corridor to a specific roadway alignment, potentially identify additional Section 4(f) resources*, identify and assess potential impacts and uses of Section 4(f) properties as defined by Section 4(f), evaluate measures to avoid or minimize impacts to Section 4(f) properties, identify and commit to measures to mitigate adverse impacts to Section 4(f) properties, assess least overall harm as warranted, and complete a Final Section 4(f) Evaluation prior to making a final Section 4(f) approval. Based on the information contained in the Final Tier 1 EIS, FHWA preliminarily determined that the 2,000- foot-wide Selected Alternative corridor minimizes impacts to Section 4(f) properties. However, if new conditions, information, or regulations that change the boundaries of Section 4(f) properties within the corridors arise before Tier 2 studies, FHWA may evaluate alternatives outside the 2,000-foot-wide corridor. ADOT will continue coordination during the Tier 2 studies with officials with jurisdiction over Section 4(f) properties where a potential use of a Section 4(f) property is identified. Coordination will focus on examining ways to avoid or minimize uses of the Section 4(f) properties in the development of alignment alternatives and on identifying appropriate mitigation. This coordination activity will enable ADOT to determine the potential for use and complete the Draft and Final Section 4(f) Evaluation(s) as required to satisfy the requirements of Section 4(f) during Tier 2.

ROD at 26–27 (emphasis added).

Defendants argue this ROD language mimics the language in *Openlands*. Hr'g Tr. at 14:21–15:01. It does not. The Final EIS in *Openlands* provides "[a] preliminary Section 4(f) approval would be subject to a reevaluation if new or more detailed information becomes available during the Tier Two NEPA studies." *Openlands*, 124 F. Supp. 3d at 810. The instant ROD indicates that ADOT may potentially identify *additional* Section 4(f) properties, such identification will take place as ADOT continues to "refine the corridor to a specific roadway alignment" *within* the selected I-11 Corridor. The ROD language does not provide that any Tier 1 findings, such as Section 4(f) determinations the FHWA relied upon to select its preferred corridor, would be reevaluated, or revisited *after* Tier 2 studies begin. Under the ROD, neither FHWA nor ADOT has an explicit obligation during Tier 2 to revisit FHWA's preliminary determinations even if new or more detailed information

becomes available during the Tier 2 NEPA studies. *See* 23 C.F.R. § 774.7(e)(1) ("This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage.").

**B. Determination of Rights or Obligations**

At this juncture, the Court also rejects Defendants' argument that while the ROD approves the selection of the Selected Corridor Alternative, the Section 4(f) Evaluation does not authorize the use of any specific Section 4(f) resources rendering Plaintiffs' claims unripe or otherwise unactionable.

> **i.   Defendants failed to raise a ripeness challenge in their Motion but are not precluded from doing so on summary judgment**

For the first time at oral argument, Defendants asserted the Section 4(f) claims are not ripe because the agencies did not approve the use of specific Section 4(f) resources. Hr'g Tr. at 09:05–10:05. Defendants contend that while the Court may dismiss the Section 4(f) claims as unripe, the Court will still need to consider how the Section 4(f) analysis informed specific corridor selections when evaluating Plaintiffs' NEPA challenges on summary judgment. Hr'g Tr. at 40:22–42:17. However, whether those Section 4(f) Tier 1 determinations preclude a meaningful analysis of alternatives at the end of the Tier 1 process is precisely the issue raised by Plaintiffs.

The Court will not decide Defendants' ripeness argument for two reasons: first, the parties did not fully brief the issue;[14] and second, ripeness is more appropriate on summary

---

[14] Plaintiffs argue their claims are ripe because: "First, delayed review would cause hardship to Plaintiffs because it would preclude meaningful Tier 1 analysis of alternatives that avoid impacts to the Monuments. Second, judicial intervention would not inappropriately interfere with further administrative action because Defendants are under no obligation during Tier 2 analysis to reconsider their conclusion that the Monuments do not qualify as Section 4(f) properties. And third, the Court would not benefit from further factual development of this issue because, again, the conclusion that the Monuments are not 4(f) properties has already been made and is not required to be revisited." Doc. 27 at 20 n.3. Defendants did not respond to this argument in their reply. *See generally* Doc. 31.

1 judgment when the Court will have before it a more complete Tier 1 administrative record.

2     **ii.**    **The Section 4(f) Evaluation made Tier 1 determinations that appear actionable**

3     Moreover, the Section 4(f) Evaluation appears to meet the second *Bennett* prong

4 because it determines "rights or obligations." *Bennett*, 520 U.S. at 177–78.  By not

5 designating certain properties as protected or unprotected under Section 4(f), Defendants

6 finalized certain legal obligations, or lack thereof. The ROD allows the process to proceed

7 to Tier 2 and moves to define the specific 400-foot alignment within the 2,000-foot selected

8 corridor while foreclosing alternatives outside the selected corridor *unless* "new conditions,

9 information, or regulations [arise] that change the boundaries of Section 4(f) properties

10 *within* the corridors[.]" ROD at 26 (emphasis added). Moreover, the ROD seems to

11 acknowledge that the Project, and the Selected Alternative Corridor, will move forward

12 notwithstanding objections from agencies following the Draft EIS and Final EIS:

13 
14         The Selected Alternative carries forward both the west option and east option in Pima County due to agency and public concerns regarding the various
15         resources along both options, allowing ADOT to make a more informed decision after completed detailed environmental and engineering studies
16         prior to selecting one of the alignments in Tier 2.

17 ROD at 23.

18     These indications seem at odds with the regulatory requirements. For example,

19 Section 4(f) directs FHWA to make the requisite Section 4(f) evaluations before issuing an

20 ROD approving a proposed construction project. *See* 23 C.F.R. § 774.9(a) ("The potential

21 use of land from a Section 4(f) property shall be evaluated as early as practicable in the

22 development of the action when alternatives to the proposed action are under study."); *see*

23 *also* 23 C.F.R. § 774.7(e)(1) ("…the documentation should address the potential impacts

24 that a proposed action will have on Section 4(f) property and whether those impacts could

25 have a bearing on the decision to be made. … This preliminary approval shall include all

26 possible planning to minimize harm to the extent that the level of detail available at the

27 first-tier EIS stage allows.").

28     Evaluating "final agency action" also requires the Court to consider the "practical

and legal effects of the agency action," and to consider finality "in a pragmatic and flexible manner." *Or. Natural Desert Ass'n*, 465 F.3d at 982 (citation omitted). Even if the Defendants did not label its decision or action as "final," it may be reviewable under the APA if it "has the status of law or comparable legal force" or if "immediate compliance with its terms is expected." *Id.* 987. Plaintiffs plead cognizable Section 4(f) violations in their Complaint alleging Defendants failed to identify all lands protected under Section 4(f), failed to determine how severely each property would be harmed, and failed to examine all feasible and prudent alternatives, before comparing and eliminating alternatives. Plaintiffs' procedural rights for further review, and Defendants' obligations under 23 C.F.R. § 774.9(a), were implicated in the ROD and Section 4(f) Evaluation. Plaintiffs also allege that this has prejudiced alternative routes that Defendants should have considered or selected. Doc. 27 at 20. Further, the Defendants failure to consider whether lands in Avra Valley were protected or unprotected under Section 4(f) may violate the statute. Doc. 27 at 17, 21–22 (citing 23 C.F.R. § 774.9(a)); *see N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1158–59 (9th Cir. 2008) (finding a violation of Section 4(f) where an agency approved a project when analysis had only been conducted for one of the project's four phases and the remaining phases would be analyzed only after the project had begun).

During the comment period, several agencies raised objections and challenged the FHWA's Section 4(f) determinations to no avail. This litigation followed. It would be impractical for the Court to review the FHWA's Section 4(f) determinations after considerably more time, effort, and resources are expended during Tier 2 pursuing an alignment within the I-11 Corridor selected during Tier 1. FHWA failed to identify any additional information bearing on its Section 4(f) Tier 1 determinations that might arise during Tier 2. If the Court does not hear Plaintiffs' Section 4(f) challenge now, the opportunity to complete a meaningful and timely Section 4(f) process will fade like a missed exit in the rearview mirror.

///

**IV.     Order**

Accordingly, at this juncture and based on the record available, the Court finds the ROD and Section 4(f) Evaluation are intertwined such that Plaintiffs' plausibly assert both final agency action and Section 4(f) claims that cannot be resolved on a motion to dismiss.

**IT IS ORDERED DENYING** Defendants' Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction (Doc. 18).

Dated this 23rd day of May, 2023.

Honorable John C. Hinderaker
United States District Judge

**APPENDIX A**



**Figure 4. End-to-End Build Corridor Alternatives**

ROD at 17.

**APPENDIX B**



**Figure 8. Selected Alternative**

ROD at 29.